1

2

3

4

5

6

7

8                      UNITED STATES DISTRICT COURT

9                      EASTERN DISTRICT OF CALIFORNIA

10                            ----oo0oo----

11

12   STAGE NINE DESIGN, LLC,           No. 2:21-cv-00722-WBS-AC

13              Plaintiff,

14        v.                           ORDER RE: DEFENDANT ROCK-IT
                                       CARGO USA, LLC'S MOTION FOR
15   ROCK-IT CARGO USA, LLC; VALUED    GOOD FAITH SETTLEMENT
     FREIGHT SERVICES, LLC;            DETERMINATION
16   GLOBALTRANZ ENTERPRISES, LLC;
     SPN CARGO, INC.; and DOES 1 to
17   20, inclusive,

18              Defendants.

19

20                            ----oo0oo----

21        Plaintiff Stage Nine Design, LLC ("Stage Nine")

22   brought this action against defendants Rock-It Cargo USA, LLC

23   ("Rock-It"), GlobalTranz Enterprises, LLC ("GlobalTranz"), SPN

24   Cargo, Inc. ("SPN"), and Valued Freight Services, LLC ("Valued

25   Freight"), for negligence, breach of contract, and violations of

26   the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C.

27   § 14706.[1]  (See generally GlobalTranz's Notice of Removal, Ex. A

28        [1]    Stage Nine's complaint was created using "Cause of

                                    1

1  ("Compl.") (Docket No. 1-1).)   Stage Nine and Rock-It reached a

2  settlement agreement in May 2021.  (Decl. of Jacob R. Fisher

3  ("Fisher Decl.") ¶ 11 (Docket No. 25).)  Rock-It now moves for a

4  determination that its settlement with Stage Nine was in good

5  faith and for an indemnity and contribution bar under California

6  Code of Civil Procedure §§ 877, 877.6.  (Mot. for Good Faith

7  Settlement Determination (Docket No. 25).)

8  I.   Factual Background

9        In April 2020, Stage Nine engaged Rock-It to arrange

10 shipping services to transport its traveling pop culture museum

11 exhibition (entitled "Hall of Heroes") from West Palm Beach,

12 Florida, to the Springfield Museum in Springfield, Massachusetts

13 in July 2020.  (Compl. ¶ 3.)  Shortly thereafter, Rock-It

14 subcontracted its obligations under the engagement to Valued

15 Freight, who subsequently subcontracted the shipment to

16 GlobalTranz.  (Compl. ¶ 4.)  On July 8, 2020, GlobalTranz hired

17 SPN to operate as the motor carrier for the shipment.  (Id.)

18       On or around July 10, 2020, SPN picked up the

19 ─────────────────────────────────────────────────────────

20 Action" forms provided by the Judicial Council of California.
   The complaint contains two "Cause of Action" forms--one for
21 breach of contract, and one for negligence--with numbered
   allegations attached to each.  (See Compl. at 14-18, 19-22.)
22 However, in the thirteenth paragraph of the allegations
   supporting each cause of action, Stage Nine alleges that
23 defendants are liable for Stage Nine's losses under 49 U.S.C.
   § 14706.  (See Compl. at 14, 19.)
24       The allegations listed in support of Stage Nine's
25 second "Cause of Action" for negligence are identical to
   allegations listed in support of its "Cause of Action" for
26 breach of contract.  (Compare Compl. at 19-22 with Compl. at 14-
   18.)  Any subsequent references to numbered allegations in Stage
27 Nine's complaint will therefore correspond with the allegations
   listed in support of Stage Nine's first "Cause of Action,"
28 located at pages 14-18 of the complaint.

exhibition trailer from West Palm Beach.  (Compl. ¶ 5.)  En route to Massachusetts, the SPN driver, Veljko, stopped at the Kenworth dealer in Riviera Beach, Florida, because he noticed the "check engine" light illuminate on his tractor.  (Id.) Stage Nine alleges that Veljko left the trailer on the street unattended and unsecured near the dealership as the tractor was being serviced.  (Id.)  On or about July 11, 2020, the trailer was stolen, and still has not been recovered.  (Id.)  Stage Nine alleges that the value of its goods inside the trailer is approximately $462,742.  (Id.)

Stage Nine and Rock-It's relationship was governed by a 2017 written agreement, in which Rock-It agreed to perform transportation brokerage services and logistics assistance on behalf of Stage Nine (the "2017 Agreement").  (Compl. ¶ 1.) (Compl. ¶¶ 1, 17-18.)  According to the terms of the 2017 Agreement, Rock-It agreed to "use its best efforts to select and engage responsible carriers, warehousemen and other transportation intermediaries . . . ."  (Compl. ¶ 2.)  Stage Nine claims that Rock-It breached the terms of the 2017 Agreement and acted negligently by "failing to use its best efforts to select and engage responsible carriers and other transportation intermediaries," failing to "ensure there was adequate insurance without exclusions to protect Stage Nine," and failing to "properly and reasonable supervise and oversee the shipment."  (Compl. ¶ 17.)  Stage Nine further claims that Valued Freight, GlobalTranz, and SPN breached their agreements under a third-party beneficiary theory and acted negligently. (Compl. ¶¶ 18-20.)

1        Stage Nine settled its claims against Rock-It in May

2   2021.  (See Fisher Decl., Ex. D ("Settlement Agreement").)  As

3   set forth in the Settlement Agreement, Stage Nine agreed to

4   waive all claims against Rock-It arising out of the

5   transportation of the Hall of Heroes exhibition, in exchange for

6   Rock-It's agreement to waive claims it has against Stage Nine

7   related to two unpaid invoices for transportation services other

8   those at issue in this case, worth $18,840.  (See id.; Fisher

9   Decl. ¶ 11; Mot. for Good Faith Settlement Determination at 7.)

10       Both Valued Freight and SPN oppose Rock-It's motion

11   for a good-faith settlement determination.  (See Valued Freight

12   Amended Opp'n (Docket No. 33); SPN Opp'n (Docket No. 35).)

13   Prior to the court's dismissal of Stage Nine's claims and SPN's

14   cross-claims against GlobalTranz for lack of personal

15   jurisdiction, GlobalTranz also filed a short "statement" joining

16   the other non-settling defendants' oppositions to Rock-It's

17   motion.  (GlobalTranz Statement (Docket No. 36).)

18   II.  Discussion

19       A.   Legal Standard

20       "Any party to an action in which it is alleged that

21   two or more parties are joint tortfeasors or co-obligors on a

22   contract debt shall be entitled to a hearing on the issue of the

23   good faith of a settlement entered into by the plaintiff . . .

24   and one or more alleged tortfeasors or co-obligors . . . ."

25   Cal. Code of Civ. P. § 877.6(a)(1).  "A determination by the

26   court that the settlement was made in good faith shall bar any

27   other joint tortfeasor or co-obligor from any further claims

28   against the settling tortfeasor or co-obligor for equitable

comparative contribution, or partial or comparative indemnity, based on comparative negligence or comparative fault." Cal. Code Civ. P. § 877.6(c). "A good faith finding also reduces the claims against the nonsettling defendants in the amount stipulated by the settlement." TSI Seismic Tenant Space, Inc. v. Superior Ct., 149 Cal. App. 4th 159, 165 (4th Dist. 2007) (citing Cal. Code Civ. P. § 877(a)). Where, as here, the plaintiff has brought claims against defendants under state law as well as the Carmack Amendment to the Interstate Commerce Act, the Ninth Circuit has held that the Carmack Amendment does not preempt California's good-faith settlement law, and therefore that California Code of Civil Procedure §§ 877 & 877.6 still apply.

In the seminal case Tech-Bilt, Inc. v. Woodward-Clyde & Associates, 38 Cal. 3d 488 (1985), the California Supreme Court identified the following non-exclusive factors courts are to consider in determining if a settlement is in good faith under § 877.6: (1) a rough approximation of the plaintiffs' total recovery and the settlor's proportionate liability; (2) the amount to be paid in settlement; (3) the allocation of settlement proceeds among the plaintiffs; (4) a recognition that a settlor should pay less in settlement than he would if he were found liable after a trial; (5) the financial conditions and insurance policy limits of the settling defendants; and (6) the existence of collusion, fraud, or tortious conduct aimed to injure the interests of non-settling defendants. Tech-Bilt, 38 Cal. 3d at 499.

"Thus, Tech-Bilt held that in determining whether a

settlement was made in good faith for purposes of section 877.6, a key factor a trial court should consider is whether the amount paid in settlement bears a reasonable relationship to the settlor's proportionate share of liability." TSI, 149 Cal. App. 4th at 166 (citing Tech-Bilt, 38 Cal. 3d at 499-500).  "This is because one of the main goals of section 877.6 is 'allocating costs equitably among multiple tortfeasors.'"  Id. "Accordingly, a court not only looks at the alleged tortfeasor's potential liability to the plaintiff, but it must also consider the culpability of the tortfeasor vis-à-vis other parties alleged to be responsible for the same injury.  Potential liability for indemnity to a nonsettling defendant is an important consideration for the trial court in determining whether to approve a settlement by an alleged tortfeasor."  Id.

Parties opposing a motion for good-faith settlement have the burden of proving that the settling parties entered into the agreement in bad faith.  Tech-Bilt, 38 Cal. 3d at 499; see also Cal. Code Civ. P. § 877.6(d) ("The party asserting the lack of good faith shall have the burden of proof on that issue.").  Ultimately, the determination is left to the trial court's discretion.  Tech-Bilt, 38 Cal. 3d at 502.

B.   Analysis

1.   Amount to be Paid in Settlement Compared to Proportionate Liability

The first, second, and fourth Tech-Bilt factors require the court to examine the amount to be paid to the plaintiff in relation to the settling party's approximate

proportionate liability.[2]  In conducting this inquiry, the court asks whether "the amount of the settlement is within the reasonable range of the settling tortfeasor's proportional share of comparative liability for the plaintiff's injuries."  Id. at 499.  The settlement amount need not equal the settling party's potential liability with mathematical certainty--it need only be "in the ballpark" of the settling party's proportionate share of liability.  Id. at 501 n.9; see also Moore v. ANG Transport Inc., No. 2:18-cv-02919 WBS KJN, 2020 WL 406777, *2 (E.D. Cal. Jan. 24, 2020).  Further, the trial court must remain mindful of the fact that settling parties often "pay less in settlement than [they] would if [they] were found liable after a trial."  Tech-Bilt, 38 Cal. 3d at 499.

Here, the amount to be paid to Stage Nine is the value of freight charges owed by Stage Nine to Rock-It on invoices other than for the items at issue in this case, or $18,840.  (Settlement Agreement at 1; Fisher Decl. ¶ 11.)  Rock-It's principal argument in support of its motion is that this amount is well "within the ballpark" of its proportionate liability because Rock-It effectively limited its liability to Stage Nine for damages or losses arising out of transportation of the Hall of Heroes exhibition via contract to $10,720. (See Mot. for Good-Faith Settlement Determination at 7-9.)

a.   Limitation of Liability via Contract

---

[2]  The court need not consider the third Tech-Bilt factor --the allocation of settlement proceeds among the plaintiffs--in this case, as there is only one plaintiff to whom the value of Rock-It's settlement will be distributed.  See Tech-Bilt, 38 Cal. 3d at 499.

1    The 2017 Agreement between Stage Nine and Rock-It

2    provides that Rock-It "will not be liable for any loss, damage,

3    or delay to goods caused by a carrier or warehouse," and that

4    "for . . . truck transportation . . . liability for damage is

5    limited to $0.50 per pound or $40 per article . . . whichever is

6    less." (2017 Agreement ¶ 1A.)  Courts routinely uphold such

7    contractual limitations on liability, even against claims of

8    negligence, so long as the agreement is "clear and explicit,

9    free of ambiguity or obscurity, and tell[s] the prospective

10   releasor he or she is releasing the other from liability."

11   Conservatorship of Link, 158 Cal. App. 3d 138, 143 (1st Dist.

12   1984); see also Nat'l Rural Telecomm. Coop. v. DIRECTTV, Inc.,

13   319 F. Supp. 2d 1040, 1048 (C.D. Cal. 2003) ("Under California

14   law, parties may agree by their contract to the limitation of

15   their liability in the event of a breach.").

16   No party seriously disputes that the language in Rock-

17   It and Stage Nine's 2017 Agreement is sufficiently clear and

18   explicit so as to limit Rock-It's liability under Stage Nine's

19   state-law claims for breach of contract and negligence to $0.50

20   per pound or $40 per article, whichever is less.[3]  Rather, the

21   non-settling defendants argue that the limitation of liability

22   clause in the 2017 Agreement is irrelevant because Rock-It faces

23   potentially greater liability under Stage Nine's third claim for

24   violations of the Carmack Amendment to the Interstate Commerce

25

26        [3]    Though Valued Freight's counsel contended at oral
     argument that there is no evidence Stage Nine signed the 2017
27   Agreement, the copy of the agreement attached to Rock-It's
     motion clearly contains the signature of the CEO of Stage Nine,
28   Troy Carlson.  (See 2017 Agreement at 3.)

1  Act.  (See Valued Freight Amended Opp'n at 2-4; SPN Opp'n at 3.)

2        The Carmack Amendment imposes liability on carriers

3  for "all losses relating to goods [the carriers] transport[] in

4  interstate commerce."  Chubb Grp. of Ins. Cos. v. H.A. Transp.

5  Sys., 243 F. Supp. 2d 1064, 1068 (C.D. Cal. 2002).  The statute

6  governs two classes of carriers: "motor carriers" and "freight

7  forwarders,"[4] 49 U.S.C. §§ 14706(a), and "absolutely preempts all

8  state common law claims against such carriers and freight

9  forwarders."  Chubb, 243 F. Supp. 2d at 1068-69.  "Brokers," by

10  contrast, are exempt from the statute's liability scheme, and

11  instead may only be held liable under state law.[5]  Id. (citing

12        [4]    The Carmack Amendment defines a "freight forwarder" as

13              a person holding itself out to the
              general public (other than as a
14              pipeline, rail, motor, or water
              carrier) to provide transportation of
15              property for compensation and in the
              ordinary course of its business—
16

17                 (A) assembles and consolidates, or
                 provides for assembling and
18                 consolidating, shipments and
                 performs or provides for break-
19                 bulk and distribution operations
                 of the shipments;

20                 (B) assumes responsibility for the
                 transportation from the place of
21                 receipt to the place of
                 destination; and
22

23                 (C) uses for any part of the
                 transportation a carrier subject
24                 to jurisdiction under this
                 subtitle.

25        49 U.S.C. § 13102(8).

26        [5]    The Carmack Amendment defines a "broker" as "a person,

27  other than a motor carrier or an employee or an agent of a motor
  carrier, that . . . sells, offers for sale, negotiates for, or
28  holds itself out by solicitation, advertisement, or otherwise as

1 | Hughes Aircraft Co. v. N. Am. Van Lines, Inc., 970 F.2d 609, 613
2 | (9th Cir. 1992)).

3 |         Thus, whether Stage Nine has a claim against Rock-It
4 | under the Carmack Amendment depends on whether Rock-It was
5 | acting as a motor carrier, freight forwarder, or a broker in the
6 | underlying transaction.  See id.  If Rock-It acted as a motor
7 | carrier or freight forwarder, the Carmack Amendment applies, and
8 | the non-settling defendants are correct that the limitation of
9 | liability clause in the 2017 Agreement alone would not operate
10 | to limit Rock-It's liability.  See Mason & Dixon Intermodal,
11 | Inc. v. Lapmaster Int'l, LLC, No. C 08-1232 VRW, 2009 WL
12 | 10680948, *8 (N.D. Cal. May 11, 2009) ("Mason & Dixon I").  If,
13 | however, Rock-It acted as a broker, Stage Nine may only hold
14 | Rock-It liable under state law, and the 2017 Agreement's
15 | limitation of liability clause is sufficient.  See id.

16 |         Each side points to evidence from the 2017 Agreement
17 | and Rock-It's "Forwarder Bill of Lading" to argue that Rock-It
18 | was acting as a freight forwarder or a broker, respectively.
19 | (See Valued Freight Amended Opp'n at 2-3; Reply to SPN Opp'n at
20 | 4 (Docket No. 38).)  Even assuming the court could resolve this
21 | dispute based on the limited evidence submitted by the parties,
22 | see Ensco, Inc. v. Weicker Transfer & Storage Co., 689 F.2d 921,
23 | 925 (10th Cir. 1982) (a carrier's status "is determined not by
24 | reference to its authority but rather by reference to what it
25 | holds itself out to be"), the court need not do so at this time.
26 | Although the Carmack Amendment generally holds carriers strictly

27 |
28 | selling, providing, or arranging for, transportation by motor
carrier for compensation."  49 U.S.C. § 13102(2).

1   liable for the full value of lost or damaged cargo, it does

2   permit carriers to effectively limit their liability in certain

3   circumstances, which are present in this case.  See Mason &

4   Dixon I, 2009 WL 10680948, at *7.

5                   b.   Limitation of Liability under the Carmack
                         Amendment
6

7        Under the Carmack Amendment, carriers may limit their

8   liability in one of two ways: via declaration by the shipper, or

9   via written agreement, as long as the agreement is reasonable

10  under the circumstances.  Id.  "Reasonableness is articulated

11  under the four-pronged Hughes test requiring carriers to (1)

12  'maintain a tariff in compliance with the requirements of the

13  Interstate Commerce Commission'; (2) 'give the shipper a

14  reasonable opportunity to choose between two or more levels of

15  liability'; (3) 'obtain the shipper's agreement as to his choice

16  of carrier liability limit'; and (4) 'issue a bill of lading

17  prior to moving the shipment that reflects any such agreement.'"

18  Mason & Dixon I, 2009 WL 10680948, at *7 (quoting Hughes

19  Aircraft v. N. Am. Van Lines, 970 F.2d 609, 611-12 (9th Cir.

20  1992)).

21       Here, the evidence shows that Rock-It successfully met

22  the requirements set forth in the Hughes test by signing the

23  2017 Agreement with Stage Nine and issuing a bill of lading for

24  the shipment at issue.  Hughes, 970 F.2d at 611-12.  The first

25  requirement, that a carrier maintain a tariff in compliance with

26  the requirements of the Interstate Commerce Commission, was

27  superseded by statute in 1995 and is no longer necessary for a

28  carrier to limit its liability under the Carmack Amendment.  See

Mason & Dixon I, 2009 WL 10680948, at *7 ("The Interstate Commerce Commission Termination Act of 1995 eliminated the need to maintain a tariff with the ICC."); 49 U.S.C. §§ 13710(a)(4), 14706(c)(1)(B).

The second requirement is that Rock-It must have given Stage Nine a reasonable opportunity to choose between two or more levels of liability. Hughes, 970 F.2d at 611-12. In their 2017 Agreement, Rock-It gave Stage Nine the opportunity to choose between a limitation of liability of $40 per article (or $0.50 per pound, whichever is less) or to purchase, for an increased fee, additional "coverage for physical loss or damage in excess of these limits by initialing the 'I do' space in [paragraph] 1B below and declaring the actual replacement value of the goods . . . ." (2017 Agreement ¶ 1A.) The Agreement goes on to "encourage[] [Stage Nine] to purchase freight insurance or to instruct Rock-It to purchase freight insurance on its behalf if the aforesaid limitations pose unacceptable risks to the customer." (Id.) The 2017 Agreement therefore clearly provided Stage Nine with "both reasonable notice of the liability limitation and the opportunity to obtain information necessary to making a deliberate and well-informed choice." Hughes, 970 F.2d at 612. Because Stage Nine signed the 2017 Agreement without requesting additional coverage or declaring the actual replacement value of its goods, Rock-It also satisfied the third Hughes requirement by obtaining Stage Nine's agreement to limit liability to $40 per article or $0.50 per pound, whichever is less. Id.; (2017 Agreement ¶ 1A).

The fourth requirement is that Rock-It must have

1   issued a bill of lading reflecting the $40 per article limited

2   liability disclaimer prior to moving the Hall of Heroes

3   exhibition.  Hughes, 970 F.2d at 611-12.  The parties have

4   submitted a document titled "Rock-It Cargo USA LLC Forwarder

5   Bill of Lading" which expressly states "Unless a greater valued

6   is declared, Shipper hereby releases the value to a maximum

7   value subject to $0.50 per lb or $40 per article, whichever is

8   less, unless otherwise indicated."  (Valued Freight Amended

9   Opp'n, Ex. 3 ("Forwarder Bill of Lading") (Docket No. 33).)

10  Stage Nine, the shipper, appears to have signed the bill of

11  lading on July 10, 2020, indicating that the bill was issued by

12  Rock-It prior to shipment in compliance with the fourth Hughes

13  requirement.  See Hughes, 970 F.2d at 611-12.

14          Accordingly, Rock-It's limitation of liability to $40

15  per article or $0.50 per pound was equally effective regardless

16  of whether the Carmack Amendment applies.  The non-settling

17  defendants' argument that Rock-It faces greater potential

18  liability under the Carmack Amendment than under Stage Nine's

19  claims for breach of contract and negligence is therefore

20  without merit.

21                  c.   Whether $18,840 fairly approximates Rock-
                         It's Proportionate Liability
22

23          Finally, the non-settling defendants argue that, even

24  if Rock-It's liability is limited to $40 per article or $0.50

25  per pound, the settlement does not fairly approximate Rock-It's

26  proportionate liability because Rock-It has not provided

27  adequate evidence of the weight or number of articles present in

28  the missing trailer.  (See Valued Freight Amended Opp'n at 6.)

                                  13

Rock-It does not make any representations as to the weight of the cargo contained with in the trailer.  Rather, Rock-It relies on an "inventory manifest" for the missing trailer to argue that the trailer contained 268 "articles," and therefore that its maximum liability is $10,720 (268 x $40).  (<u>See</u> Decl. of Jacob R. Fisher in Support of Mot. for Good-Faith Settlement Determination ¶ 14 (Docket No. 25); Decl. of Troy Carlson in Support of GlobalTranz Mot. to Dismiss, Ex. 1 ("Hall of Heroes Manifest") (Docket No. 40-2); Mot. for Good-Faith Settlement Determination at 9.)

The "inventory manifest" cited by Rock-It consists of a spreadsheet which lists the individual components of the Hall of Heroes exhibition, the value of each component, and the total cost of replacing each component (including that of any necessary labor).  (<u>See</u> Hall of Heroes Manifest.)  Rock-It appears to have derived its figure for the number of "articles" in the trailer by counting the total number of non-empty rows in the spreadsheet.  (<u>See</u> <u>id.</u>)  However, because many of the spreadsheet's entries reflect the number of labor hours that would be required to rebuild portions of the exhibition (e.g., row 1.12, "Labor Hours" for rebuilding the "Superman Statute & Phone Booth Display), and other entries reflect multiple components (e.g., row 10.7, "Custom Stands for Rubber Figurines; Qty: 180"), it is unlikely that the actual number of articles in the trailer was 268, as Rock-It contends.  Ignoring entries which estimate the number of labor hours required to replace certain portions of the exhibition, and accounting for the listed "quantity" of each entry on the spreadsheet, the true

14

1    number of lost articles on the stolen trailer appears to be

2    closer to 584.   (See id.)

3          Based on this number, Rock-It's maximum liability is

4    actually closer to $23,360, or slightly more than twice as much

5    as Rock-It contends in its motion.   Thus, the amount Rock-It has

6    agreed to pay Stage Nine ($18,840) is not 175% of its maximum

7    liability, as Rock-It argues, but closer to 80%.   Nevertheless,

8    the court is satisfied that Rock-It's settlement fairly

9    approximates its proportionate liability and therefore warrants

10   approval.   See Tech-Bilt, 38 Cal. 3d at 499.

11         The allegations and evidence before the court indicate

12   that Rock-It's conduct played a comparatively minor role

13   compared to that of other parties in causing Stage Nine's loss.

14   Stage Nine itself failed to declare the actual value of the

15   contents of the trailer or inform Rock-It that extra precautions

16   should be taken on account of the exhibition's value.   (See 2017

17   Agreement; Forwarder Bill of Lading.)   SPN, of course, is the

18   motor carrier whose negligence in leaving the trailer

19   "unattended and unsecured" overnight on the side of the road is

20   alleged to be most proximate to the loss of the trailer. (Compl.

21   ¶ 5.)   And other defendants are alleged to have had a more

22   direct role in selecting SPN as the motor carrier for the job.

23   (Compl. ¶ 4.)

24         Given Rock-It's limited role in the transaction, Stage

25   Nine's express agreement to limit Rock-It's liability to $40 per

26   article, and the fact that the California Supreme Court has

27   instructed that settling parties "should pay less in settlement

28   than [they] would if [they] were found liable after a trial,"

the court finds Rock-It's settlement to be within the reasonable range of its proportional liability.  See Tech-Bilt, 38 Cal. 3d at 499.[6]

> 2.   Rock-It's Financial Condition and Insurance Policy Limits

The fifth Tech-Bilt factor accounts for the financial condition and any applicable insurance policy limits of the settling party.  Id.  This factor is generally used to assess whether a "disproportionately low settlement" is nevertheless reasonable due to the defendant's insolvency or underinsured state.  See id.  Here, no party has provided any information indicating that Rock-It is insolvent or inadequately insured and, even if they had, the court has already determined that Rock-It's settlement fairly approximates its potential liability

---

[6]   SPN further contends that it is unclear from Rock-It's motion whether the value of its settlement with Stage Nine is $18,840 (the purported value of the outstanding invoices Rock-It has agreed not to collect) or $10,720 (the amount to which Rock-It contends its liability was limited by contract).  Because a finding of good faith reduces the amount the plaintiff may ultimately collect from non-settling defendants by the value of the settlement, see TSI Seismic, 149 Cal. App. 4th at 165, SPN argues that it would be prejudiced by the approval of Rock-It's settlement because it would be unclear how much the final judgment in this case should be reduced.  However, even assuming that SPN is correct, and the value of Rock-It's settlement is unclear, the court need not determine the exact value of the setoff to which the non-settling defendants (including SPN) are entitled until final judgment.  For the issue before the court at this juncture--whether Rock-It entered into its settlement with Stage Nine in good faith under §§ 877 & 877.6--the difference between a value of $18,840 and $10,720 is immaterial, as both values are sufficiently "within the ballpark" of Rock-It's proportional liability for the reasons discussed above. See Tech-Bilt, 38 Cal. 3d at 501 n.9.  The court will therefore not deny Rock-It's motion on the basis that the value of Rock-It's settlement is unclear, as urged by SPN.

1  in this matter and is therefore not "disproportionately low."

2  This factor therefore does not weigh against a finding of good

3  faith.  See id.

4      3. Collusion, Fraud, or Tortious Conduct

5     The sixth and final Tech-Bilt factor requires the

6  court to consider whether Stage Nine and Rock-It employed

7  collusion, fraud, or tortious conduct to injure any of the non-

8  settling defendants.  None of the non-settling defendants have

9  provided the court with any direct evidence of collusion,

10  fraudulent, or tortious conduct by Rock-It or Stage Nine.

11  Rather, the non-settling defendants ask the court to essentially

12  infer that Rock-It's primary motivation in entering into the

13  Settlement Agreement was to obtain a corresponding bar against

14  contribution and indemnity claims by the non-settling defendants

15  under § 877(b).  (See Valued Freight Amended Opp'n at 8-9; SPN

16  Opp'n at 3-4); Cal. Code Civ. P. §§ 877(b); 877.6(c).

17     Beyond merely presenting the bald assertion that there

18  is "much room for indemnity against Rock-it by . . . [Valued

19  Freight], GlobalTranz, and SPN," the non-settling defendants do

20  little to identify contractual or otherwise implied claims for

21  indemnity or contribution that a finding of good faith would

22  extinguish.  In fact, the only other defendant to deal directly

23  with Rock-It, Valued Freight, expressly agreed to defend and

24  indemnify Rock-It for any losses or damage arising out of the

25  performance of their agreement, in addition to agreeing to

26  assume full liability for any losses arising during

27  transportation of the exhibition.  (Mot. for Good-Faith

28  Settlement Determination, Ex. C ("Co-Broker Agreement") ¶¶ 8, 10

1    (Docket No. 25).)   There also does not appear to be any basis

2    for holding GlobalTranz or SPN liable based on Rock-It's

3    contract with Valued Freight under a third-party beneficiary

4    theory.   See GECCMC 2005-C1 Plummer Street Office Ltd.

5    Partnership v. JPMorgan Chase Bank, Nat. Ass'n, 671 F.3d 1027,

6    1033 (9th Cir. 2012) ("only a party to a contract or an intended

7    third-party beneficiary may sue to enforce the terms of a

8    contract").

9         To date, none of the non-settling defendants have

10   brought a single cross-claim for contribution or indemnity

11   against Rock-It.[7]  Even assuming one or more of them have claims

12   for implied indemnity or contribution under state tort law or

13   the Carmack Amendment, see 49 U.S.C. § 14706(b) (stating that

14   the carrier issuing the bill of lading is "entitled to recover

15   from the carrier over whose line or route the loss or injury

16   occurred the amount required to be paid to the owners of the

17   property"), the value of any such claim is likely to be low,

18   given that SPN's negligence appears to have been the most

19   proximate cause of the loss of the trailer and the lack of

20   evidence showing that Stage Nine informed Rock-It of the true

21   value of the trailer's cargo.   The non-settling defendants have

22   therefore failed to provide a basis upon which the court could

23   conclude that Rock-It colluded with Stage Nine or otherwise

24   _____

25        [7]   This includes SPN, which did bring a cross-claim
     against GlobalTranz prior to the dismissal of all claims against
26   GlobalTranz for lack of personal jurisdiction.  (Docket No. 7.)
     Although GlobalTranz is no longer a defendant in this action, it
27   also did not identify any potential cross-claims against Rock-It
     in its (albeit, limited) opposition to Rock-It's motion.  (See
28   GlobalTranz Statement at 2.)

1  engaged in fraud to shield itself from potential claims for

2  contribution or indemnity against it via settlement.

3        Accordingly, the court finds that the non-settling

4  defendants have failed to meet their burden of proving that

5  Rock-It entered into the Settlement Agreement with Stage Nine in

6  bad faith.  See Tech-Bilt, 38 Cal. 3d at 499.

7      B.   Rule 54(b)

8        SPN further argues that Federal Rule of Civil

9  Procedure 54(b) bars this court from finding that Rock-It and

10  Stage Nine's settlement was entered into in good faith at this

11  time.  (See SPN Opp'n 2-3.)  Rule 54(b) states that, "[w]hen an

12  action presents more than one claim for relief . . . or when

13  multiple parties are involved, the court may direct entry of a

14  final judgment as to one or more, but fewer than all, claims or

15  parties only if the court expressly determines that there is no

16  just reason for delay."  Fed. R. Civ. P. 54(b).  Rule 54 defines

17  "judgment" to include "any order from which an appeal lies."

18  Fed. R. Civ. P. 54(a).  SPN contends that, because "there is a

19  recognized right of appeal from an order entered pursuant to

20  California C.C.P. § 887," the order results in a judgment and,

21  thus, under Rule 54(b), the court may not enter such an order

22  without an express determination that there is no just reason

23  for delay.  (SPN Opp'n at 2.)

24        SPN does not cite to any authority which supports its

25  proposition that a good faith settlement order constitutes a

26  final judgment.  In fact, both cases cited by SPN specifically

27  describe a good-faith settlement determination an "interlocutory

28  decree."  Md. Cas. Co. v. Andreini & Co. of S. Cal., 81 Cal.

App. 4th 1413, 1424 (2d Dist. 2000).  While such a decree may be reviewed "by prejudgment writ [or] postjudgment appeal," it does not itself constitute a final judgment.  Id. at 1425; see also Greshko v. Cnty. of Los Angeles, 194 Cal. App. 3d 822, 827 n.1 (2d Dist. 1987) ("The ruling on the motions for determination of good faith settlement is reviewable on appeal from the judgment (order of dismissal) as an 'intermediate ruling, proceeding, order or decision which involves the merits or necessarily affects the judgment or order appealed from . . . .'").

Courts routinely enter orders determining that a settlement has been made in good faith prior to the resolution of all claims or entry of final judgment, without expressly finding that there is no just reason for delay.  See, e.g., Mason & Dixon Intermodal, Inc. v. Lapmaster Int'l, LLC, No. C 08-1232 VRW, 2009 WL 10680878, *4 (N.D. Cal. Oct. 21, 2009), aff'd Mason & Dixon Intermodal, Inc. v. Lapmaster Int'l, LLC, 632 F.3d 1056, 1064 (9th Cir. 2011); City of West Sacramento v. R and L Business Management, No. 2:18-cv-2249629 WBS EFB, 2019 WL 2249629, *4 (E.D. Cal. May 24, 2019).  Because SPN has failed to provide any authority to the contrary, the court finds that it may issue an order determining that Rock-It's settlement was entered into in good faith without an express finding that there is no just reason for delay.

IT IS THEREFORE ORDERED that Rock-It's motion for good-faith settlement determination be, and the same hereby is, GRANTED.  The court ORDERS as follows:

1. Under California Code of Civil Procedure §§ 877 and 877.6, the settlement agreement reached by the settling parties

is in good faith and is a fair, adequate, and reasonable
settlement only as to plaintiffs' claims against the settling
defendants;

      2. No contribution or indemnity claims against Rock-It
arising out of Stage Nine's Complaint or any related cross-
claims or counterclaims will be allowed.

Dated:  August 26, 2021

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE